## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

| | | |
|---|---|---|
| UNITED STATES EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, | ) ) ) | |
| Plaintiff, | ) ) | CIVIL ACTION |
| and | ) ) | No. 23-2439-KHV |
| AREEJ SAIFAN, | ) ) | |
| Intervenor Plaintiff, | ) ) | |
| v. | ) ) | |
| CHIPOTLE SERVICES, LLC, | ) ) | |
| Defendant. | ) ) ) | |

### MEMORANDUM AND ORDER

On September 27, 2023, pursuant to 42 U.S.C. § 2000e-5(f)(1), the United States Equal Employment Opportunity Commission ("EEOC") filed suit against defendant.[1] On November 29, 2023, under Rule 24(a) of the Federal Rules of Civil Procedure and 42 U.S.C. § 2000e-5(f)(1), Areej Saifan intervened. Collectively, plaintiffs assert that in violation of Title VII of the Civil Rights Act ("Title VII"), 42 U.S.C. § 2000e et seq., defendant (1) subjected Saifan to unlawful religious harassment, (2) constructively discharged her and (3) retaliated against her for reporting religious harassment. Pretrial Order (Doc. #109) filed July 31, 2024 at 10.

This matter is before the Court on Defendant's Motion For Summary Judgment And Supporting Memorandum Of Law (Doc. #113) and Plaintiffs' Motion For Partial Summary

---

[1]    Under 42 U.S.C. § 2000e-5(f)(1), if the EEOC "has been unable to secure from the respondent a conciliation agreement acceptable to the Commission," it may file a civil action against the employer, and the aggrieved party has the right to intervene in the suit. 42 U.S.C. § 2000e-5(f)(1).

Judgment (Doc. #117), both filed August 21, 2024.  For reasons stated below, the Court overrules defendant's motion and sustains plaintiffs' motion.

### Summary Judgment Standards

Summary judgment is appropriate if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.  See Fed. R. Civ. P. 56(c); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247 (1986).  A factual dispute is "material" only if it "might affect the outcome of the suit under the governing law."  Liberty Lobby, 477 U.S. at 248.  A "genuine" factual dispute requires more than a mere scintilla of evidence in support of a party's position.  Id. at 252.

The moving party bears the initial burden of showing the absence of any genuine issue of material fact.  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  Once the moving party meets this burden, the burden shifts to the nonmoving party to demonstrate that genuine issues remain for trial as to those dispositive matters for which the nonmoving party carries the burden of proof.  Applied Genetics Int'l, Inc. v. First Affiliated Sec., Inc., 912 F.2d 1238, 1241 (10th Cir. 1990); see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586–87 (1986).  To carry this burden, the nonmoving party may not rest on the pleadings but must instead set forth specific facts supported by competent evidence.  Nahno-Lopez v. Houser, 625 F.3d 1279, 1283 (10th Cir. 2010).  In applying these standards, the Court views the factual record in the light most favorable to the party opposing the motion for summary judgment.  Dewitt v. Sw. Bell Tel. Co., 845 F.3d 1299, 1306 (10th Cir. 2018).  The Court may grant summary judgment if the nonmoving party's evidence is merely colorable or not significantly probative.  Liberty Lobby, 477 U.S. at 250–51.  Essentially, the inquiry is "whether the evidence presents a sufficient disagreement to require

submission to the jury or whether it is so one-sided that one party must prevail as a matter of law." Id. at 251–52.

## **Factual Background**

The following facts are undisputed or, where disputed, viewed in the light most favorable to the non-movant.

Areej Saifan is a Muslim woman and wears a hijab. Muslim codes of behavior, religious law and centuries of teachings address modesty and hair coverings.[2] Muslim holy scripture, the Qur'an, references women's dress twice, including for the express purpose of avoiding harassment. For devout Muslims, wearing a hijab can be understood "as an essential expression of their commitment to living a godly and pious life," and it is "connected to control over one's own physical body." Expert Report Of Homayra Ziad (Doc. #131-13) filed September 11, 2024 at 3. The involuntary removal of a hijab is objectively offensive—the act "is comparable to pulling off someone's clothing to see their breasts or genitals." Id.

## I.    **Chipotle's Operations**

Chipotle Mexican Grill, Inc. owns and operates fast casual restaurants throughout the United States, Canada and Europe that serve a focused menu of Mexican fare, consisting primarily of burritos, tacos and salads. Chipotle Services, LLC employs the workers in those restaurants.

A.    Personnel At The Lenexa Location

In February of 2020, Saifan began working as a part-time crew member at a Chipotle location in Lenexa, Kansas. Javier Giovanni Salcedo was general manager of the Lenexa

---

[2]    On October 7, 2024, the Court overruled defendant's motion to exclude the expert testimony of Dr. Homayra Ziad. See Order (Doc. #155). Accordingly, the Court considers Dr. Ziad's expert report on defendant's motion for summary judgment.

restaurant.  Salcedo supervised and managed Saifan, and typically prepared employee schedules for that location.  Saifan was a student at Johnson County Community College and on some unspecified date before August 9, 2021, Saifan set her class schedule and informed Chipotle that starting August 23, 2021, she could only work one day per week.

At the Lenexa location, Chipotle also employed Tala Abu-Jubara, Kimberly Benavente-Fernandez and Kevin Silva Garcia.  Abu-Jubara, Saifan's cousin, worked as a crew member.  Like Saifan, she is a Muslim woman and wears a hijab.  Benavente-Fernandez worked as a kitchen manager.[3]  Garcia worked as an apprentice—an employee training to become a general manager. Apprentice job duties include (1) leading day-to-day operations of the restaurant; (2) identifying, hiring, training and developing new crew members; (3) providing exceptional customer service; (4) maintaining budgets set by the general manager; (5) participating in personnel decisions, including transfers and terminations; and (6) assisting the general manager in administrative duties. An apprentice acts as general manager when the general manager is not present.  Garcia reported to Salcedo, who reported to David Clark, a field leader for Chipotle.[4]

B.    Chipotle Workplace Policies

Chipotle maintains Equal Employment Opportunity, anti-discrimination, anti-harassment and anti-retaliation policies (often referred to as its "Respectful Workplace Policy"), which feature prominently in its employee handbook.  The handbook provides that if employees feel that they

---

[3]    Some time between July and September of 2021, Chipotle promoted Benavente-Fernandez to services manager.  The parties have presented conflicting evidence as to when this promotion occurred and dispute the admissibility of her employment records.  Because this fact is immaterial to the Court's resolution of the summary judgment motions, it need not resolve the dispute on this record.

[4]    Field leaders supervise a group of six to ten Chipotle restaurants.

-4-

have been harassed, discriminated against or retaliated against, they should immediately report the conduct to their manager or make an anonymous complaint by telephone. The anti-harassment policy requires managers to report harassment that they observe and escalate complaints of harassment that they receive.

The handbook also prohibits employees from providing false, dishonest or misleading information, or making any dishonest or false statement to a third party with respect to the performance of the employees' job duties. Chipotle does not permit employees to engage in any kind of illegal activity—whether on duty or not—if the conduct is detrimental to Chipotle's reputation. Chipotle may discipline, terminate or report to law enforcement any employees found to be in violation of these policies.

On February 6, 2020, Saifan received and electronically acknowledged Chipotle's handbook. On April 12, 2021, she received and acknowledged an updated version of it.

## II.    Saifan's Interactions With Garcia

On two or three occasions in July of 2021, Garcia asked to see Saifan's hair, which her hijab covered.[5] Garcia asked ten to 15 times per occasion, and his repeated questions made Saifan uncomfortable.[6] Saifan told Benavente-Fernandez and Abu-Jubara about Garcia's questions. On at least one occasion, Abu-Jubara heard Saifan ask Garcia to stop asking to see her hair, and Benevente-Fernandez heard Saifan explain her hijab's religious significance to Garcia. On multiple occasions, Garcia also asked Abu-Jubara to see her hair. Like Saifan, Abu-Jubara refused, asked him to stop and explained the religious significance of her hijab. During Chipotle's eventual

---

[5]    In July and August of 2021, Saifan was 19 years old.

[6]    The record does not identify the exact dates of Garcia's questions.

investigation, Benavente-Fernandez told Human Resources that Garcia would talk about Saifan's hijab "all the time."  Deposition Of Kimberly Benavente-Fernandez (Doc. #114-4) filed August 21, 2024 at 101:21–25.  Until August 9, 2021, Garcia and Saifan were friendly with each other and would joke around when working together.

On August 9, 2021, Benavente-Fernandez asked Garcia to help close the restaurant, even though Chipotle had not scheduled him to work that day.  During closing, Saifan was cleaning the restaurant, and Benavente-Fernandez and Garcia were working by the cashier screen.  Garcia asked to see Saifan's hair.  She again refused and asked him to stop.  Saifan turned toward Garcia to discourage further questions, and as she turned, Garcia pulled on her hijab, pulling it off halfway.  Saifan's hair was visible through a sheer layer of fabric which remained on her head.  Once she turned fully, Saifan saw Garcia smirking and laughing.  Saifan was shocked and scared; her first instinct was to fix her hijab because her hair was exposed, so she went to the back office to fix it.  Later, she tried to explain to Garcia that him asking to see her hair was the equivalent of her asking to see his genitalia.  Saifan asked him, "let me see your dick."  Deposition Of Areej Saifan (Doc. #114-2) at 70:9.  Garcia responded to Saifan to the effect of, "do you want to see it?"  Id. at 70:13.  Abu-Jubara and Benavente-Fernandez witnessed these events.

**III.    Saifan's Reports And Chipotle's Investigation**

At 11:13 P.M. that night, after her shift had ended, Saifan sent a group text message to Clark and Salcedo.  Saifan told them as follows:

> Kevin [Garcia] keeps asking to see my hair.  I keep telling him no, this is the 2nd or third time these past 2 months he as [sic] asked me . . . I kept saying stop and saying it's not funny . . . Kevin came in tonight to help us close, and he kept asking can I see your hair Areej.  I kept sayin [sic] no and to stop, and then he came behind me and lightly tugged my scarf off and it came off half way.  I immediately turned around and told him to stop and to never do that again and it wasn't funny . . . He was just smirking after pulling my scarf off.  I have never experienced so much

racism in my life . . . I don't want anything to happen but just for the two of you too [sic] inform him to not do it anymore and to not bring it up.

Saifan's Text Messages (Doc. #114-2) at 348–49.

Clark responded at 9:08 A.M. the following morning, August 10, 2021, stating, "I will address this issue immediately and this will be solved." Id. at 349. Saifan "liked" the message. Later that morning, Clark went to the restaurant to speak with Garcia. They spoke for approximately five to ten minutes, and Clark instructed Garcia to stop asking to see Saifan's hair or touching her hijab. Garcia agreed without objection.

That same day, August 10, 2021, Saifan resigned, identifying August 24, 2021 as her last day with Chipotle. Although she had considered quitting before the incident for other reasons, she was never serious until after Garcia's attack. Along with Saifan, four other employees—Abu-Jubara, Benavente-Fernandez, Keith Roath and one other employee—submitted resignation notices that day. Collectively, the five employees posted one notice on the restaurant's bulletin board, stating that each of their last days would be August 24. Abu-Jubara resigned because of Garcia's conduct on August 9. The record does not reflect why the remaining employees resigned. When Salcedo arrived at the restaurant on August 11, he discovered the resignation note. He attempted to contact Saifan, but she did not return his calls.

Later that day, at 10:13 P.M., Saifan sent a text message to Clark requesting an update on the investigation. Before Clark could respond, Saifan also contacted the Respectful Workplace Hot Line (Chipotle's Human Resources). At 6:43 A.M. on August 12, Clark replied to Saifan's text message, "I have spoken with Kevin and he understands that his actions were inappropriate. I believe he will act appropriately going forward. If you have any more concerns, please let me know. Thank you." Clark's Text Message (Doc. #131-8).

A few hours before Clark responded, at 1:48 A.M. on August 12, 2021, Saifan had posted the following on Twitter: "@ChipotleTweets My manager pulled off my hijab yesterday and still got no update on what happened.  How do you guys feel about that. #chipotle."  Saifan's Tweet (Doc. #131-11).  Chipotle's Twitter account responded to Saifan stating, "Thank you for reaching out. We take these concerns very seriously.  Please send us a direct message with your contact info so we can share that with the appropriate team."  Id.  As directed, Saifan messaged Chipotle directly on Twitter.  Her message stated as follows:

> My name is Areej Saifan, I talked to [C]hipotle HR about this and I'm waiting for a call back.  But I'm very uncomfortable in my workplace and I can't see myself going in anymore.  My number is [redacted].  My email is [redacted].  I was harassed and discriminated in my workplace and my manager is taking this lightly.

Saifan's Direct Message (Doc. #131-12).

On August 13, 2021, Saifan filed a police report based on Garcia's attack.  That same day, Nickole Iula, an investigator with Chipotle's Respectful Workplace team called, texted and emailed Saifan to follow up on her concerns.  Saifan would not speak with or respond to her.  On August 17, 2021, Respectful Workplace again followed up with Saifan.  The following day, Saifan responded that she was considering speaking to them about the incident.  She never did so.  She did not want to speak to anyone at Chipotle—she never called Iula back and she never responded to participate in an investigation.[7]

Saifan worked her scheduled shifts on August 13, 14 and 15; she did not work any of these shifts with Garcia.  After August 15, Chipotle did not schedule her for additional shifts.[8]  On

---

[7]     Saifan did, however, participate in four televised interviews about the incident.

[8]     Saifan was not aware who prepared the schedules following her resignation, or

(continued. . .)

August 17, 2021, Salcedo texted Saifan asking, "Do you want to work this Sunday at Juan's store 4-11[?] Would you like to transfer there that way you don't lose your job?"[9]  <u>Salcedo's Text Message</u> (Doc. #131-6).  Of the five employees who resigned on August 10, two worked through August 24, their notice period.[10]  Chipotle did not schedule Saifan and Abu-Jabara beyond August 15, and Saifan never asked for more shifts.[11]  Clark testified that Chipotle did not schedule Saifan because she was a part-time employee and had previously requested to only work one day a week due to her class schedule.  Saifan believed that Chipotle had stopped scheduling her because of her harassment report and resignation.  She had expected to be scheduled through August 24, 2021—her last day with Chipotle.

---

[8] (. . .continued)
when those schedules were prepared.  Clark testified that typically, Salcedo prepared the schedules for the Lenexa location.  Defendant argues that "Chipotle typically makes schedules weeks before a particular workweek," but cites no evidence to this effect.  <u>Defendant's Response In Opposition To Plaintiffs' Partial Motion For Summary Judgment</u> (Doc. #129) filed September 11, 2024 at 19.  The record is devoid of evidence of (1) who prepared the schedules for the period after August 15 and (2) when the schedules were prepared.

[9]      English is not Salcedo's first language, and Clark testified that Salcedo's text did not mean to suggest that defendant had anything to do with Saifan losing her job, but was just trying to ask whether Saifan preferred to work at Juan's store instead of quitting.  <u>Clark Deposition</u> (Doc. #114-5) at 154–55; <u>Defendant's Response</u> (Doc. #129) at 12.  The parties did not depose Salcedo, <u>see</u> <u>Plaintiff EEOC's Notice Of Cancellation Of Deposition Of Javier Giovani Salcedo</u> (Doc. #92) filed June 10, 2024, and the text is self-explanatory.  For these reasons, the Court does not consider Clark's speculation as to Salcedo's intentions.  <u>See</u> Fed. R. Evid. 602 (witness must have personal knowledge of the matter).

[10]      Again, the record does not reflect whether defendant created the schedule before or after the employees' resignation.

[11]      The record contains no evidence that defendant only scheduled employees upon request.

Even without Saifan's participation, Chipotle conducted an investigation and interviewed Garcia, Clark, Salcedo, Benavente-Fernandez and others.  On August 20, 2021, based on its internal investigation, Chipotle terminated Garcia's employment for his conduct on August 9, as well as other policy violations.[12]  On August 23, 2021, Chipotle emailed Saifan to explain the results of the investigation, confirm that Chipotle had taken appropriate responsive action and inform her that Chipotle would be closing the case.

Saifan experienced anxiety, sleep and appetite disruptions, nausea and isolation following the events of August 9.  Her family noticed these changes.

## IV.    EEOC Administrative Process

On August 23, 2021, Saifan filed a Charge of Discrimination with the EEOC.  On the charge, Saifan checked the "Religion" box.  In a one-page summary, she described (1) her employment with Chipotle, (2) her identity as a Muslim woman, (3) Garcia's harassment, (4) her complaints regarding his conduct and (5) how Chipotle did not schedule her to work after she gave her two-week notice.  On August 31, the EEOC notified Chipotle of Saifan's charge.  On June 9, 2022, Saifan filed an amended charge with the EEOC, checking the "Religion" and "Retaliation" boxes.  The amended charge provided additional details about her employment, her complaints to management, her decision to resign and how Chipotle treated her differently from other non-Muslim employees who had resigned the same day.  On July 6, 2022, the EEOC sent Chipotle notice of the amended charge.

On January 23, 2023, the EEOC issued a Letter of Determination, finding reasonable cause to believe that in July and August of 2021, Chipotle had harassed and constructively discharged

---

[12]    In part, the investigation revealed that in violation of Chipotle's relationship policies, Garcia had been in a consensual romantic relationship with Benavente-Fernandez.

Saifan based on religion and retaliated against her because of her opposition to harassment. In the letter, the EEOC invited the parties to participate with it in informal methods of conciliation. On March 23, the EEOC issued a Conciliation Letter to Chipotle.[13] This letter outlined nine monetary and non-monetary terms that the EEOC sought to resolve the matter. Between January 13 and May 12, 2023, the EEOC engaged in multiple communications with Chipotle, including at least one telephone conference on March 27, to discuss conciliation proposals. On April 14, Chipotle responded to the terms outlined in the EEOC's determination letter and proposed additional terms. On April 24, the EEOC responded, noting concern that Chipotle's monetary offer and other proposed terms would not adequately address the harm that Saifan had suffered. The EEOC did not provide a counteroffer on monetary relief or the scope of injunctive relief. It gave Chipotle ten days to revise its offer. On May 12, Chipotle responded, stating that because the EEOC was not participating in the process in good faith, it would not be engaging in further negotiations.

On May 24, 2023, the EEOC notified Chipotle that conciliation efforts were unsuccessful. Natasha DeGuire, Area Director of the Kansas City Area Office of the EEOC, testified that because "the EEOC concluded that further efforts in conciliation would not result in the EEOC being able to secure from Chipotle a conciliation agreement acceptable to the EEOC," it "issued a notice to Chipotle stating that the conciliation efforts required by law had occurred but were unsuccessful,

---

[13]    Plaintiffs object to defendant's introduction of confidential conciliation communications, asserting that absent the written consent of all parties, no party can use anything said or done during such informal endeavors as evidence in a subsequent proceeding. 42 U.S.C. § 2000e-5(b). On October 15, 2024, the Court overruled plaintiffs' motion to strike the confidential conciliation material from defendant's response because the EEOC did not dispute that (1) by seeking summary judgment on defendant's failure to conciliate defense, it opened the door to communications about its conciliation efforts and (2) the declaration of defendant's counsel is credible evidence that the agency did not attempt to engage in a discussion about conciliating the claim. See Memorandum And Order (Doc. #157). The Court therefore considers the conciliation communications.

and that the EEOC had determined that further conciliation efforts would be futile or non-productive." Declaration Of Natasha DeGuire (Doc. #121-7) filed August 21, 2024, ¶ 8.

As noted, the EEOC filed suit on September 27, 2023 and on November 29, Saifan intervened. Plaintiffs assert claims under Title VII for unlawful religious harassment, constructive discharge and retaliation. Pretrial Order (Doc. #109) at 10. Defendant asserts 19 affirmative defenses, including the Faragher-Ellerth[14] and after-acquired evidence defenses, statute of limitations and failure to conciliate. Id. at 11–13.

On August 21, 2024, both parties filed motions for summary judgment. See Defendant's Motion For Summary Judgment (Doc. #113) and Plaintiffs' Motion For Partial Summary Judgment (Doc. #117).

## Analysis

Defendant seeks summary judgment on plaintiffs' three Title VII claims: hostile work environment, constructive discharge and retaliation. Defendant argues that (1) plaintiffs cannot establish that any harassment was based on Saifan's religion or was severe or pervasive; (2) the Faragher-Ellerth defense bars plaintiffs' hostile work environment claim; (3) plaintiffs cannot establish that working conditions were so intolerable that Saifan had no choice but to quit; (4) the statute of limitations bars plaintiffs' retaliation claim; (4) plaintiffs cannot demonstrate that Saifan suffered adverse employment action that was causally connected to her complaints of harassment; and (5) defendant had a legitimate, nondiscriminatory reason for not scheduling Saifan after her resignation.

---

[14]    Faragher v. City of Boca Raton, 524 U.S. 775 (1998); Burlington Indus., Inc. v. Ellerth, 524 U.S. 742 (1998).

Plaintiffs seek partial summary judgment on three of defendants' affirmative defenses: failure to conciliate, statute of limitations and the after-acquired evidence defense. Specifically, plaintiffs assert that (1) by issuing a letter of determination and engaging in communications with defendant, the EEOC satisfied its conciliation obligations; (2) Saifan filed her amended charge within 300 days of August 13, 2021 and therefore the statute of limitations does not bar her retaliation claim; and (3) defendant has proffered no evidence that it would have terminated Saifan's employment had it known of her conduct in violation of defendant's policies. In addition, plaintiffs seek summary judgment on the issue whether Garcia was a supervisor under Title VII.

## I.    **Defendant's Motion For Summary Judgment**

### A.    <u>Hostile Work Environment</u>

Plaintiffs assert that in violation of Title VII, defendant subjected Saifan to unlawful religious harassment. Defendant argues that it is entitled to summary judgment because plaintiffs cannot establish that any harassment was based on Saifan's religion or was sufficiently severe or pervasive to alter the conditions of her employment.

Before the United States Supreme Court decided <u>Muldrow v. City of St. Louis, Mo.</u>, 601 U.S. 346 (2024), the law was well established that to prove a hostile work environment under Title VII, plaintiffs must show that (1) defendant discriminated against Saifan because she is Muslim and (2) the discrimination was sufficiently severe or pervasive such that it altered the terms or conditions of her employment. <u>See</u> <u>Throupe v. Univ. of Denver</u>, 988 F.3d 1243, 1251 (10th Cir. 2021). In hostile work environment cases, the alteration to a term or condition of employment is the hostile work environment itself. <u>See</u> <u>Nat'l R.R. Passenger Corp. v. Morgan</u>, 536 U.S. 101, 116 (2002) (term of employment to not work in "discriminatorily hostile or abusive environment");

see also Kramer v. Wasatch Cnty. Sheriff's Off., 743 F.3d 726, 743 (10th Cir. 2014) (hostile work environment based on protected characteristic alters terms and conditions of employment).

In Muldrow, however, the Supreme Court altered the Title VII landscape, holding that when plaintiffs bring suit under Title VII's discrimination prong, they need not show that harm was "significant" or "any similar adjective suggesting that the disadvantage to the employee must exceed a heightened bar." Muldrow, 601 U.S. at 355. Instead, plaintiffs need only show "some harm" or "some disadvantageous change" with respect to an identifiable term or condition of employment. Id. at 354–55. It held that Title VII's anti-discrimination provision simply "seeks a workplace where individuals are not discriminated against" because of traits such as religion, and "thus flatly prevent[s] injury to individuals based on status, without distinguishing between significant and less significant harms." Id. at 358 (internal citations omitted).

As of yet, the Tenth Circuit has not cited or discussed Muldrow. The extent (if any) to which Muldrow will revolutionize Title VII case law is not yet clear. Unfortunately for purposes of this order, the parties do not share their views on Muldrow or how it impacts the question whether Saifan experienced a hostile work environment. Nevertheless, hostile work environment is a form of discrimination actionable under Title VII's anti-discrimination provision. Meritor Sav. Bank, FSB v. Vinson, 477 U.S. 57, 66 (1986). The Court therefore views plaintiffs' hostile work environment claim through the lens of Muldrow and asks whether plaintiffs can establish that Saifan suffered some harm or some disadvantageous change with respect to an identifiable term or condition of her employment on account of a hostile work environment. See Juarez v. Midwest Division – OPRMC, LLC, No. 23-2417-KHV, 2024 WL 4679220, at *6 (D. Kan. Nov. 5, 2024).

-14-

<u>Muldrow</u> did not impact the requirement that Garcia's harassment must have been based on Saifan's religion.  The Court begins there.

        1.      Whether Garcia's Harassment Was Based On Religion

Defendant argues that plaintiffs have failed to establish that Garcia harassed Saifan because she is Muslim.  Specifically, defendant points to Saifan's deposition where, when asked if she knew why Garcia pulled on her hijab, she stated, "No, I don't know why."  <u>Saifan Deposition</u> (Doc. #114-2) at 78:10–14.  Defendant contends that plaintiffs have failed to present any evidence that Garcia pulled on Saifan's hijab or asked to see her hair because she is Muslim.

To maintain a claim under Title VII, plaintiffs must show that defendant discriminated against Saifan based on religion, which need only be a "motivating factor" in the unlawful employment practice.  <u>See</u> <u>Throupe</u>, 988 F.3d at 1251; 42 U.S.C. § 2000e-2(m).  To show this, plaintiffs may present evidence of (1) conduct which, on its face, was motivated by religious animus or (2) facially neutral conduct that when viewed in the context of other, overtly discriminatory conduct, supports a finding of religious animus.  <u>See</u> <u>Throupe</u>, 988 F.3d at 1251.

Plaintiffs have presented evidence that (1) Saifan is a Muslim woman and wears a hijab; (2) for devout Muslims, wearing a hijab can be understood "as an essential expression of their commitment to living a godly and pious life," and it is "connected to control over one's own physical body;" (3) on two or three occasions in July of 2021, Garcia asked to see Saifan's hair, which was covered by her hijab; (4) Saifan and Abu-Jubara had explained to Garcia the religious significance of the hijab; and (5) on August 9, 2021, when Saifan again refused to show Garcia her hair, he pulled on her hijab.  <u>Dr. Ziad Expert Report</u> (Doc. #131-13) at 3.  Viewing the evidence in the light most favorable to plaintiffs, plaintiffs have easily demonstrated a genuine issue of material fact whether Garcia's harassment was based on Saifan's religion.  Saifan wears her hijab

because of her religion, and Garcia's harassment stemmed from and centered around her hijab. The Court overrules defendant's motion for summary judgment on this issue.

    2.    Whether Saifan Suffered Harassment That Was Severe Or Pervasive

Defendant seeks summary judgment on plaintiffs' hostile work environment claim, arguing that plaintiffs cannot establish that the alleged harassment was severe or pervasive.  As noted, under Muldrow, to maintain a hostile work environment claim based on religion, plaintiffs need only show "some harm" or "some disadvantageous change" with respect to an identifiable term or condition of employment.[15]  Muldrow, 601 U.S. at 354–55.

Plaintiffs have presented evidence that (1) on two or three occasions over the course of one month, Garcia asked to see Saifan's hair, which was covered by her hijab; (2) on each occasion, Garcia asked ten to 15 times; (3) each time, Saifan refused and explained the religious significance of her hijab; (4) for Muslims, a hijab's involuntary removal is objectively offensive—the act "is comparable to pulling off someone's clothing to see their breasts or genitals;" (5) Garcia's requests made Saifan uncomfortable and she said as much to her co-workers; (5) on August 9, 2021, after Saifan again refused to show Garcia her hair, Garcia pulled on her hijab, partially revealing her hair; (7) Saifan was shocked and scared because her hair was exposed; and (8) Saifan resigned because of Garcia's actions.  Expert Report Of Homayra Ziad (Doc. #131-13) at 3.

Again, viewing this evidence in the light most favorable to plaintiffs, a jury could easily find that defendant subjected Saifan to some harm with respect to an identifiable term of condition

---

[15]    Muldrow is difficult to reconcile with pre-existing case law that to be actionable under Title VII, a hostile work environment must be severe or pervasive.  See Harris v. Forklift Sys., Inc., 510 U.S. 17, 21 (1993).  Employer conduct which falls well short of that standard could easily expose plaintiffs to some harm or some disadvantageous change in the terms or conditions of employment.  Because the parties have not briefed that issue, the Court declines to further address it at this time.

of her employment.   See Morgan, 536 U.S. at 116 (term of employment to not work in "discriminatorily hostile or abusive environment"); see also Kramer, 743 F.3d at 743 (hostile work environment based on protected characteristic alters terms and conditions of employment).  Saifan has presented evidence that she found Garcia's conduct extremely offensive and humiliating, and she felt uncomfortable and scared in her workplace—so much so that she also filed a police report based on the events.  Plaintiffs have therefore demonstrated a genuine issue of material fact which is sufficient to defeat defendant's motion for summary judgment on the issue.

        3.    The Faragher-Ellerth Defense

Defendant argues that even if plaintiffs can show a hostile work environment, it is entitled to summary judgment under Faragher-Ellerth.   Under this defense, an employer may escape vicarious liability for the harassing acts of its supervisory employees if it proves a two-pronged affirmative defense: (1) it "exercised reasonable care to prevent and correct promptly any [] harassing behavior" and (2) Saifan "unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise."   Faragher, 524 U.S. at 807; Ellerth, 524 U.S. at 765.  The defense applies only if the harassing supervisor took no tangible employment action against Saifan.  See Harrison v. Eddy Potash, Inc., 248 F.3d 1014, 1024 (10th Cir. 2001) (citing Faragher, 524 U.S. at 807).   A tangible employment action is "a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." Ellerth, 524 U.S. at 761.

In its motion for summary judgment, defendant assumes that Garcia was a supervisory employee.[16]  Defendant argues that Garcia took no tangible employment action against Saifan because she voluntarily resigned.  As discussed in the next section, plaintiffs have demonstrated a genuine issue of material fact whether defendant constructively discharged Saifan.  Assuming (as defendant does) that Garcia is a supervisory employee, defendant is not shielded from liability because a genuine issue of material fact exists whether he took tangible employment action against Saifan.  For this reason, the Court overrules defendant's motion for summary judgment on its Faragher-Ellerth defense.

In short, defendant is not entitled to summary judgment on any aspect of plaintiffs' hostile work environment claim.

B.      Constructive Discharge

Plaintiffs assert that in violation of Title VII, defendant constructively discharged Saifan. Defendant seeks summary judgment, arguing that (1) plaintiffs cannot establish intolerable working conditions and (2) Saifan did not give it enough time to correct the issue before she voluntarily resigned.

Constructive discharge occurs "when an employer, through unlawful acts, makes working conditions so intolerable that a reasonable person in the employee's position would feel forced to resign."  Exum v. U.S. Olympic Comm., 389 F.3d 1130, 1135 (10th Cir. 2004).  The Court evaluates the voluntariness of an employee's resignation under an objective, totality of the

---

[16]      In response to plaintiffs' motion for summary judgment, defendant contends that Garcia was not a supervisor under Title VII.  Specifically, in that context, defendant argues that Garcia did not have tangible employment authority because he could not hire, fire or make other employment-related decisions without involving the general manager.  The Court addresses that argument in the context of plaintiffs' motion.

circumstances standard. <u>Id.</u> at 1136. Constructive discharge requires more than actionable harassment or discrimination. <u>Fischer v. Forestwood Co.</u>, 525 F.3d 972, 981 (10th Cir. 2008); <u>see also</u> <u>Exum</u>, 389 F.3d at 1135 (racial harassment and hostility "does not come close to demonstrating that [p]laintiff's resignation was objectively involuntary").

Defendant argues that plaintiffs cannot establish that working conditions were so intolerable that Saifan had no reasonable choice but to resign. Specifically, defendant asserts that Saifan was already considering quitting before the incident on August 9, she agreed to continue working for two weeks after she resigned and she did work three shifts after her resignation. Moreover, defendant argues that Saifan resigned the day after Garcia pulled on her hijab, failing to give it a reasonable time to take any corrective action. Defendant relies on <u>Yearous v. Niobrara Cnty. Mem'l Hosp. By & Through Bd. of Trs.</u>, 128 F.3d 1351, 1357 (10th Cir. 1997), in which the Tenth Circuit found no constructive discharge when an employee failed to give the employer a reasonable chance to correct the problem. Plaintiffs respond that Garcia's constant verbal harassment and physical attack led her to (1) feel uncomfortable and scared in the workplace and (2) she therefore filed a police report based on Garcia's conduct, thus creating intolerable working conditions. In her message to Chipotle's Twitter account, Saifan stated, "I'm very uncomfortable in my workplace and I can't see myself going in anymore." <u>Saifan's Direct Message</u> (Doc. #131-12). Further, Saifan was not the only employee that resigned following the attack—four other employees also resigned the next day.

Viewing the evidence in the light most favorable to plaintiffs, a rational jury could conclude that working conditions were so intolerable that Saifan had no choice but to quit. The fact that Saifan was willing to work three shifts while defendant investigated is not fatal to her claim; it goes merely to the credibility of her claim that working conditions were intolerable. Similarly, the

fact that Saifan gave notice one day after the incident is not dispositive.  "Reasonableness" is a fact-intensive relative question, typically reserved for the jury.  In a case involving especially egregious conduct, a reasonable time to allow the investigation to proceed could be no time at all; Title VII does not require that an employee submit to intolerable working conditions while defendant investigates. Plaintiffs have shown a genuine issue of material fact whether Saifan's resignation was involuntary.  The Court therefore overrules defendant's motion for summary judgment on plaintiffs' constructive discharge claim.

C.    Retaliation

Plaintiffs assert that in violation of Title VII, defendant retaliated against Saifan for reporting religious harassment by not scheduling her to work after her resignation.  Defendant seeks summary judgment on plaintiff's retaliation claim, arguing that (1) the statute of limitations bars her claim; (2) plaintiffs cannot establish a prima facie case of retaliation; (3) defendant had a legitimate, non-discriminatory reason for her schedule; and (4) plaintiffs cannot show pretext.

Where plaintiffs seek to establish a Title VII retaliation claim through indirect or circumstantial evidence, the burden-shifting framework of McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973) applies.  Pinkerton v. Colo. Dep't of Transp., 563 F.3d 1052, 1064 (10th Cir. 2009).  Once plaintiffs have demonstrated a prima facie case, the burden shifts to defendant to "articulate a legitimate, nondiscriminatory reason for the adverse employment action."  Meiners v. Univ. of Kan., 359 F.3d 1222, 1229 (10th Cir. 2004).  If defendant articulates a legitimate reason for the action, then plaintiffs must demonstrate that its asserted reasons are pretextual.  Id.

To establish a prima facie case of retaliation, plaintiffs must demonstrate that (1) Saifan engaged in protected opposition to discrimination; (2) she suffered adverse employment action which would dissuade a reasonable worker from making or supporting a charge of discrimination;

-20-

and (3) a causal connection exists between her protected activity and the adverse action.  See Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53, 68 (2006); Fassbender v. Correct Care Sols., LLC, 890 F.3d 875, 890 (10th Cir. 2018).

     1.    Whether Title VII's Statute Of Limitations Bars Plaintiffs' Claim

Defendant first argues that the statute of limitations bars plaintiffs' retaliation claim.  To assert claims under Title VII, a plaintiff must have filed a charge of discrimination within 300 days of the dates that she alleges the retaliatory conduct took place. 42 U.S.C. § 2000e-5(e)(1).  Under Title VII, if a plaintiff fails to timely file an EEOC charge regarding each discrete employment incident or adverse action, defendant may raise the affirmative defense of failure to exhaust administrative remedies.  Lincoln v. BNSF Ry. Co., 900 F.3d 1166, 1185 (10th Cir. 2018); see Morgan, 536 U.S. at 113.

Saifan resigned on August 10, 2021.  On August 23, 2021, she filed a Charge of Discrimination with the EEOC, on which she had checked the "Religion" box.  In that charge, she described her employment with Chipotle, her identity as a Muslim woman, Garcia's harassment, her complaints regarding his conduct and how defendant did not schedule her for any shifts after she gave her two-week notice.  On June 9, 2022, Saifan filed an amended charge with the EEOC. On that charge, she checked the "Religion" and "Retaliation" boxes.

Defendant argues that Saifan had until June 6, 2022 (300 days after she resigned on August 10, 2021) to file a charge of discrimination alleging retaliation.  Defendant contends that because Saifan filed her amended charge on June 9, 2022, it is untimely.  Plaintiffs respond that defendant's retaliation occurred between August 15 and August 24, 2021 (when it failed to schedule her), and 300 days after August 15, 2021 was June 11, 2022.  Moreover, plaintiffs point to Saifan's original charge, which specifically referenced (1) defendant's failure to schedule her

to work after she tendered her resignation and (2) Salcedo's text message that she could "transfer" to avoid "los[ing] her job."

While the record does not contain evidence of when defendant retaliated against Saifan by failing to schedule her, plaintiffs have presented evidence between August 16 and August 23, she did not work because defendant did not schedule her. Saifan filed her amended charge within 300 days of that period, and therefore it is timely. Even if the amended charge was outside the limitations period, failure to check a box on a charge of discrimination is not dispositive, but rather "creates a presumption that she was not asserting claims represented by boxes not checked." Gunnell v. Utah Valley State Coll., 152 F.3d 1253, 1260 (10th Cir. 1998). Plaintiffs can rebut this presumption by the factual allegations in Saifan's charge. Id. Here, Saifan included factual allegations of retaliation in her original charge. Therefore, even if her amended charge is untimely, plaintiffs have rebutted the presumption that Saifan was not asserting a retaliation claim in her original charge. Defendant has failed to show that as a matter of law, the statute of limitations bars plaintiffs' retaliation claim and the Court overrules its motion on this issue.[17]

2.    Plaintiffs' Prima Facie Case

As noted, to establish a prima facie case of retaliation, plaintiffs must demonstrate that (1) Saifan engaged in protected opposition to discrimination; (2) she suffered adverse employment action which would dissuade a reasonable worker from making or supporting a charge of discrimination; and (3) a causal connection exists between her protected activity and the adverse

---

[17]    Also, even if defendant is right, plaintiffs can claim retaliation within the 300 days prior to June 9, 2022—August 13, 2021. Failing to schedule Saifan would be continuing retaliation, so the statute of limitations would not be a total defense.

action.  White, 548 U.S. at 68; Fassbender, 890 F.3d at 890.  Defendant argues that plaintiffs cannot establish the second or third elements.

i.      Adverse Employment Action

As discussed, Muldrow altered the Title VII landscape for discrimination claims.  Importantly, however, Muldrow distinguished adverse employment action in the context of Title VII discrimination claims and adverse employment action in the context of Title VII retaliation claims.  Muldrow, 601 U.S. at 357.  Though the Supreme Court purported to lower the bar for adverse employment action in discrimination cases, it reaffirmed that in retaliation cases, plaintiffs must still show that the retaliatory action caused a "significant" harm, i.e. the employer took action serious enough to dissuade a reasonable worker from making or supporting a charge of discrimination.  Id.; White, 548 U.S. at 68.   The Supreme Court drew this distinction based on the purpose behind the two statutory provisions.  Muldrow, 601 U.S. at 357.  The purpose behind Title VII's anti-retaliation provision was to capture employer actions "serious enough to dissuade a reasonable worker from making or supporting a charge of discrimination," and if an action caused less serious harm, it would not deter Title VII enforcement and thus fell outside the purposes of the ban on retaliation.  Id.

Defendant argues that Saifan did not suffer adverse employment action because she worked three shifts after her resignation and never asked for more shifts. Defendant asserts that Saifan could have asked for more shifts, and it would have given them.  Plaintiffs respond that after Saifan's complaint and resignation, defendant removed her from the work schedule which caused her to lose wages.

Plaintiffs have presented evidence that (1) on August 9, Saifan reported Garcia's conduct to Clark and Salcedo; (2) on August 10, she resigned; (3) she worked her previously scheduled

shifts on August 13, 14 and 15; (4) defendant did not schedule her for additional shifts after August 15, despite her last day being August 24; (5) of the four employees who also tendered notice of resignation on August 10, two worked through their notice periods, but Saifan and Abu-Jubara—both Muslim employees—did not work beyond August 15;[18] and (6) on August 17, Salcedo texted Saifan, "Do you want to work this Sunday at Juan's store 4-11[?] Would you like to transfer there that way you don't lose your job?" Salcedo Text Message (Doc. #131-6).

Defendant presents no evidence that as a matter of general practice, its employees must affirmatively ask to be scheduled. Viewing the evidence in the light most favorable to plaintiffs, they have shown a genuine issue of material fact whether defendant's conduct would have dissuaded a reasonable employee from making or supporting a charge of discrimination. The Court overrules defendant's motion for summary judgment on this element of plaintiffs' prima facie case.

ii.    Causal Connection

Defendant also argues that plaintiffs cannot demonstrate a causal connection between Saifan's report of harassment and the post-resignation schedule. Plaintiffs may show a causal connection by "evidence of circumstances that justify an inference of retaliatory motive, such as protected conduct closely followed by adverse action." Burrus v. United Tel. Co. of Kan., Inc., 683 F.2d 339, 343 (10th Cir. 1982). Unless close temporal proximity exists between the protected activity and the retaliatory conduct, plaintiffs must offer additional evidence to establish causation. O'Neal v. Ferguson Constr. Co., 237 F.3d 1248, 1253 (10th Cir. 2001).

---

[18]    The record does not contain the work schedule of the fifth employee.

Defendant argues that plaintiffs have proffered no evidence of when the schedule was prepared or who prepared it, so plaintiffs cannot tie this act to Saifan's report of harassment. In defendant's motion, however, defendant asserts that "Given [Saifan's] limited availability and Saifan's resignation, Chipotle made a regular business decision to omit her from the next restaurant schedule during her final week." Defendant's Motion For Summary Judgment (Doc. #113) at 35. In other words, defendant admits that the decision not to schedule Saifan occurred immediately after her protected activity.

Plaintiffs highlight the close temporal proximity of defendant's adverse action, arguing that such evidence justifies an inference of retaliatory motive. See Allen v. Garden City Co-op, Inc., 651 F. Supp. 2d 1249, 1259 (D. Kan. 2009) ("Because of the close temporal proximity of either one month or one week between the alleged protected activity and adverse action, the Court finds that Plaintiff has established causation."). Plaintiffs argue that six days after Saifan complained to Clark and Salcedo, and four days after she complained to HR, defendant stopped putting her on the schedule. This timing is well within the spectrum of what courts have found to establish a prima facie case of a causal connection. See id. On this record, defendant has not shown that as a matter of law, it is entitled to summary judgment on the issue of causation. The Court overrules defendant's motion on this element of plaintiffs' prima facie case.

### 3. Defendant's Legitimate, Nondiscriminatory Reason

Because plaintiffs have set forth a prima facie case of retaliation, the burden shifts to defendant to proffer a legitimate, non-discriminatory reason for its decision. Defendant argues that it did not schedule Saifan because (1) she had previously requested to work one shift per week due to her upcoming school semester and (2) she had resigned without requesting additional shifts.

Because defendant has offered a non-discriminatory reason, plaintiffs must establish by a

preponderance of the evidence that the legitimate reason offered by defendant was not the true reason but rather was pretext for retaliation. See Trujillo v. PacifiCorp, 524 F.3d 1149, 1154–55 (10th Cir. 2008). To defeat summary judgment, plaintiffs' burden is only to demonstrate a genuine issue of material fact whether the proffered reason is unworthy of belief. Id. at 1158. Pretext can be shown by weaknesses, implausibilities, inconsistencies, incoherencies or contradictions in the employer's proffered legitimate reasons for its action such that a reasonable factfinder could rationally find them unworthy of credence and infer that the employer did not act for the asserted non-discriminatory reasons. Id. Pretext can be shown a variety of ways, including through differential treatment of similarly situated employees and procedural irregularities. Id.

Plaintiffs have provided evidence that (1) Saifan's request to be scheduled for one shift per week did not take effect until August 23, and Chipotle removed her from the schedule on August 15 at the latest; (2) Saifan gave two weeks of notice rather than resigning immediately, which indicated her desire to continue working; and (3) of the employees who resigned on August 10, two continued working during the following two weeks, but defendant did not schedule Saifan and Abu-Jubara beyond August 15. On this record, plaintiffs have shown a genuine issue of material fact whether defendant's stated reason is worthy of belief. Plaintiffs have highlighted the differential treatment of other employees and weaknesses in defendant's proffered reason, i.e. the fact that Saifan's reduced schedule was not even in effect at the time. The Court therefore overrules defendant's motion for summary judgment on plaintiffs' retaliation claim.

## II.     Plaintiffs' Motion For Summary Judgment

Plaintiffs seek summary judgment on three of defendant's affirmative defenses: failure to conciliate, statute of limitations and the after-acquired evidence defense. Plaintiffs also seek summary judgment on the issue whether Garcia was a supervisor under Title VII.

A.    <u>Whether The EEOC's Failure To Conciliate Bars Plaintiffs' Claims</u>

Defendant asserts that because the EEOC failed to fulfill its duty to conciliate before commencing this action, its failure bars plaintiffs' claims.

Title VII imposes a duty on the EEOC to attempt conciliation of a discrimination charge before filing a lawsuit. <u>Mach Mining, LLC v. E.E.O.C.</u>, 575 U.S. 480, 487 (2015). The EEOC must (1) inform the employer about the specific allegation, as the EEOC typically does in a letter announcing its determination of "reasonable cause" and (2) engage the employer in some form of discussion, so as to give the employer an opportunity to remedy the unlawful conduct. <u>Id.</u> at 494. "Title VII ultimately cares about substantive results, while eschewing any reciprocal duties of good-faith negotiation." <u>Id.</u> at 491. Because Congress granted the EEOC discretion in its strategic decisions in conciliation, including (1) "whether to make a bare-minimum offer, to lay all its cards on the table, or to respond to each of an employer's counter-offers, however far afield," (2) "the pace and duration of conciliation efforts," (3) "the plasticity or firmness of its negotiating positions" and (4) "the content of its demands for relief," the Court's judicial review of conciliation efforts is quite limited. <u>Id.</u> at 492. The Court reviews only whether the EEOC attempted to confer about a charge and not to what happened (<u>i.e.</u> statements made or positions taken) during the conciliation discussions. <u>Id.</u> at 494.

Failure to conciliate is not an affirmative defense; rather, "the appropriate remedy is to order the EEOC to undertake the mandated efforts to obtain voluntary compliance." <u>Id.</u> at 495; <u>see also</u> 42 U.S.C. § 2000e–5(f)(1) (authorizing stay of Title VII action for that purpose).

Here, the parties do not dispute that the EEOC sent defendant a determination letter, which informed defendant of Saifan's allegations, and engaged in multiple email exchanges discussing remedial terms. Rather, defendant contests the sufficiency of the discussions and whether the

EEOC participated in them in good faith.  Defendant cites no authority that good faith is the standard by which the Court reviews conciliation efforts.  See Mach Mining, 575 U.S. at 491 (Title VII "eschew[s] any reciprocal duties of good-faith negotiation.").  Moreover, judicial review of conciliation efforts does not include review of what happened—statements made or positions taken during discussions.  Id. at 494.  Defendant's challenge to the sufficiency of the discussions is therefore outside the scope of judicial review.  On this record, the EEOC fulfilled all obligations required of it under Mach Mining.  Moreover, because failure to conciliate is not an affirmative defense, plaintiffs are entitled to summary judgment.  The Court therefore sustains plaintiffs' motion for summary judgment on the issue.

B.    Whether The Statute Of Limitations Bars Plaintiffs' Retaliation Claim

As noted, defendant asserts that Saifan filed her amended charge of discrimination more than 300 days after defendant's alleged retaliation, so plaintiffs' retaliation claim is untimely. Plaintiffs seek summary judgment on defendant's affirmative defense.[19]  Specifically, plaintiffs argue that (1) Saifan filed her amended charge within 300 days of when defendant first failed to schedule her (August 15, 2021); (2) Saifan's original charge included allegations of retaliation; (3) Saifan's amended charge relates back to her original filing date because it corrects a technical deficiency and amplifies her original allegations; and (4) the EEOC may file suit on claims that it discovers during the course of an investigation, even if not included in a charge of discrimination.

---

[19]     Both parties seek summary judgment on whether plaintiffs' retaliation claim was part of a timely-filed EEOC charge.  When parties file cross-motions for summary judgment on the same issue, the Court treats the motions separately; the denial of one does not require the grant of another. Christian Heritage Acad. v. Okla. Secondary Sch. Activities Ass'n, 483 F.3d 1025, 1030 (10th Cir. 2007).  Here, the Court has already held that defendant did not show that as a matter of law, the statute of limitations bars plaintiffs' retaliation claim.  It now separately considers plaintiffs' motion on the issue.

As noted, to assert claims under Title VII, Saifan must have filed a charge of discrimination within 300 days of the dates that she alleges the retaliatory conduct took place.  See 42 U.S.C. § 2000e-5.

Defendant argues that plaintiffs have presented no evidence that it made the schedule after August 13, 2021 (300 days before Saifan filed her amended charge) and therefore plaintiffs have not shown an alleged unlawful action within the limitations period.  As noted, the record is devoid of evidence indicating when defendant prepared the schedule following Saifan's resignation, and it is equally devoid of evidence about when plaintiff learned that she had not been scheduled. Accordingly, in evaluating when defendant allegedly retaliated, the Court is left with the undisputed fact that between August 16 and August 23, because defendant did not schedule her, plaintiff did not work.  Saifan filed her amended charge within 300 days of that period.  Therefore, defendant has not demonstrated a genuine issue of material fact with respect to its defense that the statute of limitations bars plaintiffs' retaliation claim.[20]  The Court sustains plaintiffs' motion for summary judgment on defendant's statute of limitations defense.

C.    Whether Defendant Would Have Terminated Saifan's Employment

Defendant asserts the after-acquired evidence defense to limit Saifan's claim for economic damages.  Plaintiffs seek summary judgment on defendant's after-acquired evidence defense, arguing that defendant has presented no evidence that it would have terminated Saifan for violating

---

[20]    Moreover, because the EEOC can file suit based on unlawful employment practices that it discovers in the course of a reasonable investigation, the EEOC properly brought plaintiffs' retaliation claim.  Gen. Tel. Co. v. EEOC, 446 U.S. 318, 331 (1980) ("any violations that the EEOC ascertains in the course of a reasonable investigation of the charging party's complaint are actionable"); Letter Of Determination (Doc. #121-5) at 1 (EEOC obtained evidence that defendant "stopped scheduling [Saifan] for shifts because she complained of the harassment").

its policies.[21]  Specifically, plaintiffs argue that defendant's initial disclosures list no witness with knowledge of the company's termination policies, policies against fraud or any other information related to its after-acquired evidence defense, nor has defendant produced any documents that it has ever fired any employee for misconduct while working for other employers.

As set forth in the pretrial order, plaintiffs request (1) that the Court order defendant to reinstate plaintiff's employment and (2) front pay in the amount of $23,055.32.  Pretrial Order (Doc. #109) at 13–14.  As a general rule, where an employer discovers evidence of wrongdoing which would have led to the employee's termination based on lawful, legitimate grounds, an employee may not receive reinstatement or front pay as a remedy for unlawful employment discrimination.  McKennon v. Nashville Banner Pub. Co., 513 U.S. 352, 359–62 (1995).  To prevail on an after-acquired evidence defense, defendant must show "that the wrongdoing was of such severity that the employee in fact would have been terminated on those grounds alone if the employer had known at the time of the discharge."  Id. at 362–63; see also Perkins v. Silver Mtn. Sports Club & Spa, LLC, 557 F.3d 1141, 1145 (10th Cir. 2009).

1.    Whether Defendant Disclosed Clark

In opposition to plaintiffs' motion for summary judgment, defendant submits the second declaration of David Clark in which he testifies that as a field leader, he has terminated others' employment based on violation of defendant' employment policies and had he known of Saifan's fraudulent conduct outside of Chipotle, he would have terminated her employment.

---

[21]    As to the merits of the after-acquired evidence defense, defendant has presented evidence of Saifan's employment with Helper's Inc. (an agency that serves as a payroll agent for recipients on a Medicaid Waiver in Kansas) and time fraud that she committed during the course of her employment there. Because the specifics of Saifan's conduct are immaterial to the Court's resolution of plaintiffs' motion for summary judgment on the defense, it does not delve into the undisputed facts of her employment with Helper's.

Plaintiffs argue that the Court cannot consider this declaration because (1) defendant's initial disclosures under Rule 26(a)(1)(A)(i), Fed. R. Civ. P., list no witness with knowledge of the company's termination policies, policies against fraud or any other information related to this defense; and (2) despite learning of this defense on May 7, 2024 (at the latest), defendant never supplemented its disclosures or discovery responses.[22]  Plaintiffs argue that because defendant never disclosed Clark to testify on this subject, defendant denied them the opportunity to conduct discovery on the defense and defendant cannot now use Clark's declaration that he would have fired Saifan.

Defendant responds that in its initial disclosures, it disclosed Clark as a witness to testify to its defenses and it also included any witness which it discovered during discovery.  Defendant further contends that because it had already listed Clark, it had no obligation to supplement its disclosure after it learned information related to this specific defense.   Exhibit 8, titled "Defendant's Initial Disclosures," provides as follows:

> Based upon Chipotle's investigation and information to date, the following persons may have information relevant to the averments made by Plaintiff and Intervenor in their Complaints, and/or in relation to Chipotle's defenses hereto: * * *
>
> **David Clark** ("Clark") – Clark was a Field Leader with Defendant during the pertinent time and has knowledge regarding [Saifan]'s report that is the subject of her Complaint and her resignation. * * *
>
> **Any other witnesses disclosed or discovered through formal discovery**.

---

[22]    In the pretrial order, defendant asserts that it first discovered Saifan's Medicaid fraud on April 22, 2024, when it received Saifan's work records from Helper's.  Pretrial Order (Doc. #109) at 10.  Then, in response to plaintiffs' motion, defendant contends that it did not learn the information until May 7, 2024, at plaintiff's deposition.  Defendant's Response In Opposition (Doc. #129) at 8.  Either way, defendant did not discover information related to this defense until discovery was well underway.

Defendant's Initial Disclosures (Doc. #121-8) (emphasis in original).  Defendant argues that this disclosure fully complies with the requirements of Rule 26.

Under Rule 26, parties must provide the name, address, telephone number and subject of the information for any individual that may have discoverable information that the disclosing party may use to support its claims or defenses.  Fed. R. Civ. P. 26(a)(1)(A)(i).  Initial disclosures should provide an opposing party with information essential to the proper litigation of all relevant facts and to eliminate surprise.  Poitra v. Sch. Dist. No. 1 in the Cnty. of Denver, 311 F.R.D. 659, 663 (D. Colo. 2015).  Rule 26 also requires a party to supplement its mandatory disclosures "at appropriate intervals" if that party "learns that in some material respect the information disclosed is incomplete or incorrect and if the additional or corrective information has not otherwise been made known to the other parties during the discovery process or in writing."[23]  Fed. R. Civ. P. 26(e)(1).

Here, defendant did not sufficiently disclose Clark as a witness to its after-acquired evidence defense.  As noted, Rule 26 requires that defendant provide the "subject of the information" to which the individual could testify.  Defendant disclosed that Clark had information on Saifan's report of harassment and her resignation.  Defendant relies on the boilerplate opening paragraph of its disclosures to argue that it disclosed Clark as a witness to testify to "its defenses." If this were a sufficient disclosure, defendant could assert that every listed person was identified to testify on each and every claim and defense, which would defeat the purpose of Rule 26(a). Moreover, because defendant's initial disclosure did not sufficiently disclose Clark, defendant had

---

[23]    Under the scheduling order in this case, the parties had until 40 days before the deadline to complete discovery to supplement their initial disclosures.  Revised Scheduling Order And Order On Motion To Extend Scheduling Order (Doc. #59) filed March 26, 2024 at 2.  Here, the discovery deadline was June 17, 2024, so supplemental disclosures were due May 8, 2024.

a duty to supplement its disclosures during discovery once it learned the facts material to its defense. The summary judgment record contains no supplemental disclosures.

### 2. Whether Defendant Can Use Clark's Declaration

Under Rule 37(c)(1), "if a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless." Fed. R. Civ. P. 37(c)(1). The Court has discretion in deciding whether a Rule 26 violation is justified or harmless and when doing so, should consider "(1) the prejudice or surprise to the party against whom the testimony is offered; (2) the ability of the party to cure the prejudice; (3) the extent to which introducing such testimony would disrupt the trial; and (4) the moving party's bad faith or willfulness." Jacobsen v. Deseret Book Co., 287 F.3d 936, 953 (10th Cir. 2002).

As the party that failed to disclose, defendant bears the burden to show that its failure was substantially justified or harmless. See Fish v. Kobach, 309 F. Supp. 3d 1048, 1115 (D. Kan. 2018). Here, defendant does not meet this burden because it denies that it failed to disclose Clark. Defendant had ample opportunity to supplement its disclosures following Saifan's deposition, and it did not do so. Plaintiffs would be prejudiced by the consideration of such evidence because they were unable to ask Clark about the defense in his deposition, serve written discovery testing the claim or search for contradictory or otherwise relevant evidence. The Court therefore prohibits defendant from now using Clark's second declaration to oppose plaintiffs' summary judgment motion. As a result, defendant has presented no evidence that Saifan engaged in unlawful conduct which was detrimental to Chipotle's reputation or that Chipotle would have terminated Saifan for

doing so.  The Court therefore sustains plaintiffs' motion for summary judgment on defendant's after-acquired evidence defense.

> D.    Whether Garcia Was A Supervisor Under Title VII

Plaintiffs seek summary judgment on the issue whether Garcia was a supervisor under Title VII.  For purposes of Title VII, employees are "supervisors" when "the employer has empowered that employee to take tangible employment actions against the victim, i.e., to effect a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." Vance v. Ball State Univ., 570 U.S. 421, 431 (2013).  Even if not empowered to take tangible employment action, an employee may still be a "supervisor" if he works closely with his or her subordinates and has the power to recommend, substantially influence or indirectly effectuate tangible employment actions.  Kramer, 743 F.3d at 738.

Plaintiff argues that Garcia was a supervisor because as an apprentice to the general manager, he could (1) lead day-to-day operations of the restaurant; (2) identify, hire, train and develop crew members; (3) participate in personnel decisions, including transfers and terminations; and (4) act as general manager when the general manager was not present in the restaurant.  Defendant argues that Garcia was not a supervisor under Title VII because (1) in her deposition, Saifan could not remember whether anyone other than Salcedo was her supervisor, and she was unsure whether Garcia had the authority to hire or fire employees; and (2) Garcia could not take tangible employment action without the involvement and oversight of Salcedo.

As to defendant's first argument, Saifan's personal knowledge is irrelevant.  Defendant cites no authority—and the Court finds none—that this is the relevant legal standard.  As to defendant's second argument, defendant largely ignores relevant law that an individual can still be

a supervisor even if not empowered to directly take tangible employment action against an employee.  Even if Garcia could not act on his own, he worked closely with crew members and worked "shoulder to shoulder" with Salcedo, who did have power to take tangible employment action.  Apprentice Job Description (Doc. #122-2) at 1.  On this record, viewing the evidence in the light most favorable to defendant, plaintiffs have shown that as a matter of law, Garcia was a supervisor.  The Court sustains plaintiffs' motion for summary judgment on this issue.

**IT IS THEREFORE ORDERED** that Defendant's Motion For Summary Judgment And Supporting Memorandum Of Law (Doc. #113) filed August 21, 2024 is **OVERRULED.**

**IT IS FURTHER ORDERED** that Plaintiffs' Motion For Partial Summary Judgment (Doc. #117) filed August 21, 2024 is **SUSTAINED.**

Dated this 3rd day of December, 2024 at Kansas City, Kansas.

s/ Kathryn H. Vratil
KATHRYN H. VRATIL
United States District Judge